**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                            :
IN RE:                          :         CHAPTER 13
                                            :
DIODATO J. MORIN and FRANCES    :
C. MORIN ,                      :         CASE NO. 04-46138 (NLW)
                                            :
            Debtor.             :
_____:

> **FILED**
> JAMES J. WALDRON, CLERK
>
> July 11, 2006
>
> U.S. BANKRUPTCY COURT
> NEWARK, N.J.
> BY: /s/Diana Reaves, Deputy

**Before:**     **HON. NOVALYN L. WINFIELD**

**A P P E A R A N C E S :**

Leonard C. Walczyk, Esq.
Wasserman, Jurista & Stolz, P.C.
225 Millburn Avenue, Suite 207
P.O. Box 1029
Millburn, NJ 07041
Attorneys for Debtors.

Frank E. Catalina, Esq.
Margulies, Wind & Herrington P.C.
Harborside Financial Center
32nd Street, Suite 1201
Jersey City, New Jersey 07302
Co-Counsel for Debtors.

Deborah A. Silodor, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068
Attorneys for Retirement Plan of Washington Savings Bank

This matter came before the Court on the debtor's objection to the proof of claim filed by the Retirement Plan of Washington Savings Bank in RSI Retirement Trust ("Plan").  By agreement between the parties, the issue for consideration by the court was  limited to whether the Plan could set-off its claim for the allegedly improperly paid disability retirement benefits against the debtor's retirement benefits when he becomes eligible for such benefits.  As set forth below, the Court finds that the Plan cannot exercise set-off of its claim against the debtor's claim for retirement benefits.

**JURISDICTION**

This Court has jurisdiction to review and determine this matter pursuant to 28 U.S.C. §§1334 and 157(a), and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).  The following constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure § 7052.

**STATEMENT OF FACTS**

The parties in the instant matter have long been embroiled in litigation with regard to  Diodato Morin's ("Morin") discharge from his employment at Washington Savings Bank ("WSB").  Morin has been unwavering in his claim that he was wrongfully terminated and that he became psychologically disabled as a result of the termination.  WSB has equally steadfastly maintained that Morin was terminated for

2

misconduct and that he did not suffer any debilitating consequences from termination. Among the litigations between the parties was a suit that Morin commenced in the United States District Court for the District of New Jersey to recover a disability retirement benefit from the Retirement Plan of Washington Savings Bank in RSI Retirement Trust (the "Plan"). Morin and the Plan settled that litigation with the Plan agreeing to pay Morin the disability retirement benefits which Morin claimed. However, the Plan did not waive any of the terms and conditions of the Plan. Following settlement, the lawsuit was dismissed in July 1998.

Morin's receipt of disability retirement benefits was challenged in November 2002. The Employee Benefits Committee of the Retirement Plan ("Committee") determined from the evidence presented to it, that Morin was no longer eligible to receive benefits because Morin was not totally and permanently disabled (the "Adverse Determination"). The Committee also determined that an effort should be made to recover from Morin the disability retirement benefits which it determined should not have been paid. Accordingly, the Committee authorized its counsel to commence suit.

In June 2003, the Committee notified Morin of its Adverse Determination and of his right to appeal the Adverse Determination to the Bank's Audit Committee within 180 days of his receipt of the notice of the Adverse Determination. The Committee agreed to make retirement disability payments to Morin during the 180 day appeal period. Morin appealed the Adverse Determination before the Committee on or about December 8, 2003.

While Morin's appeal was under consideration, on February 6, 2004, the Plan commenced suit against Morin in the United States District Court for the District of New Jersey. The Plan asserted claims for restitution, unjust enrichment and fraud as a result of Morin's allegedly improper receipt of disability

3

retirement payments.[1]  Just a few days later, on February 12, 2004, the Bank's Audit Committee advised Morin that it denied his appeal.  It also directed that Morin's disability retirement benefits be immediately terminated.  The Plan subsequently amended its complaint to reflect denial of Morin's appeal and discontinuance of his benefits.  Consequently, in June 2004, Morin filed an amended answer and counterclaim in which (i) he denied that any grounds exist to recover the disability retirement payments that he has already received, and  (ii) he claimed that termination of his benefits was unlawful and done in violation of the terms of the Plan.  Accordingly, Morin sought damages for benefits allegedly wrongfully withheld.

Subsequently, on November 15, 2004, Morin and his wife Frances C. Morin (collectively  "the Morins") filed the Chapter 13 case now pending before the Court.  The Morins scheduled the Plan as an unsecured creditor holding an unliquidated, disputed claim in the amount of zero dollars.  In response, the Plan timely filed a proof of claim for $143,090 for wrongfully paid disability retirement benefits for the period July 29, 1998,  through February 12, 2004.  The Plan alleges that its claim is a secured claim because 11 U.S.C. § 553(a) permits it  to set-off its overpayment of disability retirement benefits against retirement benefits which will become payable to Morin when he reaches retirement age.

The Morins have objected  to the claim by the Bank on the following grounds: (1) the plan is not entitled, either legally or equitably, to set-off benefits allegedly improperly paid against retirement benefits to be paid;  (2) his benefits were terminated in violation of the express terms of section 7.04 of the

---

[1] Morin counterclaimed for reinstatement of his disability retirement benefits.  The Plan moved for referral of the counterclaim to the Bankruptcy Court.  By order dated April 28, 2005, the Honorable Faith S. Hochberg granted the relief requested.

4

governing agreement; (3) the decision to terminate his benefits was made on inappropriate evidence; (4) the Plan cannot prove that Morin committed any fraud; and (5) the retirement benefits due Morin are exempt property against which the Plan cannot claim a set-off for alleged overpayment of his disability benefits.

At all times involving this dispute, the governing agreement has been The Retirement Plan of Washington Savings Bank in Retirement System for Savings Institutions, as Amended and Restated as of October 1, 1985 (the "Plan Agreement"). Article VII of the Plan Agreement provides for a "normal retirement benefit" (§ 7.1), an "early retirement benefit" (§ 7.2), a "vested retirement benefit" (§ 7.3) or a "disability retirement benefit" (§ 7.4). Under the Plan Agreement, a participant is not eligible for either a normal retirement benefit or a vested retirement benefit until the participant has attained his "normal retirement date," which is defined as the first day of the month coincident with or next following the participant turning 65 (§§ 1.25 and 1.27). The Plan concedes that Morin will not attain the age of 65 until after his Chapter 13 Plan is completed.

The Plan Agreement also contains a provision embodying the ERISA anti-alienation prohibition. Section 1056(d)(1) requires that each pension plan "provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). Section 13.2 of the Plan Agreement provides that:

> Benefits payable under the Plan shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either voluntary or involuntary and any attempt to so anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, garnish, execute, levy, or otherwise affect any right to benefit payable hereunder, shall be void. Notwithstanding the foregoing, the Plan shall permit the payment of benefits in accordance with a qualified domestic relations order as defined in Section 414(p) of the Code.

5

Notably, this section does not specifically permit the Plan to recoup or set-off overpayments to Plan participants. Likewise, it does not specifically prohibit recoupment or set-off.

At a status conference with the Court, Morin and the Plan agreed that resolution of disputed factual matters should be held in abeyance pending determination of the ERISA issues, and whether the Plan may set-off its claim against Morin's future retirement benefits. Following oral argument on these issues, the Court also required the parties to file post-hearing briefs regarding the applicability of In re University Medical Center, 973 F.2d 1065 (3d Cir. 1992) to the issue of set-off.

## **DISCUSSION**

The critical issue presented by the parties is whether the Plan has the right to set-off the pre-petition alleged overpayments of disability benefits against future retirement benefits that Morin will be entitled to receive. This issue requires the Court to analyze the Plan claim under both ERISA and the Bankruptcy Code.

### **I. Setoff Under ERISA**

Morin argues that under ERISA the Plan is not entitled to any legal or equitable right of set-off with regard to retirement benefits that he will receive in the future. First, he contends that set-off is explicitly prohibited by 29 U.S.C. § 1056(d)(1), which provides that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." Second, in reliance on Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365 (1990) and Matorana v. Board of Trustees of Steamfitters Local Union 420 Health, Welfare and Pension Fund, 404 F. 3d 797 (3d Cir. 2005), Morin argues that the

Plan may not assert equitable set-off.

The Court finds Morin's argument is flawed by his failure to read § 1056(d)(1) in conjunction with Department of Treasury Regulation § 1.401(a)-13(c)(1) and (2)("Treasury Regulation"). Notwithstanding § 1506(d)(1), these regulations do in fact permit plans to recover the overpayment of benefits. Subsection (c)(1) of the regulation defines alienation or assignment as:

> [a]ny direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all or any part of a plan benefit which is, or may become, payable to the participant or beneficiary.

26 C.F.R. § 1.401(a)-13(c)(1).

On its face, this language seems to support Morin's contention. However, subsection (c)(2)(iii) of the Treasury Regulation specifically provides that the terms "alienation" and "assignment" do not include "[a]ny arrangements for the recovery by the plan of overpayment of benefits previously made to a participant." 26 C.F.R. § 1.401(a)-13(c)(2)(iii). Indeed, the courts have relied on these regulations to determine that a benefit plan is authorized to withhold benefits to compensate for prior overpayments. See, Eubanks v. Prudential Ins. Co. Of America, 336 F. Supp. 2d 521, 531-32 (M.D.N.C. 2004)(previous overpayment of disability benefits can be setoff against any present claim); Tucker v. General Motors Ret. Program, 949 F. Supp. 47, 55 (D. Mass. 1996)(temporary withholding of retirement benefits to recover overpayment of early retirement supplement is permissible and does not violate ERISA).

Moreover, in Coar v. Kazimir, 990 F.2d 1413, 1421-22 (3d Cir. 1993) the Third Circuit described at length the application of the Treasury Regulations. After describing the definitions found in the regulations, the Third Circuit observed that "... they specifically exclude from ERISA's anti-alienation

7

bar actions by the pension plan itself to apply or set-off vested pension benefits to recover debts owed by the participant to the plan as a result of a prior overpayment of benefits or as a result of the failure by a participant to repay a debt to the plan." 990 F. 2d at 1422. The Court further elaborated that "[h]ence, the regulations clearly comprehend 'garnishment' or 'alienation' as referring to actions by third parties, such as a beneficiary's employer or creditors, and not as recoupment by the pension plan." Id.

Although it is not precisely the same issue before this Court, the analysis provided in Coar is instructive. In Coar the plan participant was a former pension fund trustee who was convicted of engaging in a RICO conspiracy to receive kickbacks in exchange for channeling $20 million from the pension fund to a mortgage company. 990 F.2d at 1414. The conviction was preceded by a civil case in which the pension fund obtained a judgment for $25,535,887.[2] Prior to the entry of the judgment, the pension fund informed Coar that it would set-off Coar's liability to the pension fund against his benefits from the fund. Id. Thereafter Coar brought suit to obtain his benefits and the pension fund counterclaimed for a declaratory judgment that its withholding of benefits did not violate ERISA's non-forfeiture and anti-alienation provisions. Id. at 1415.

When the case came before it, the Third Circuit considered whether Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365 (1990) required a finding in favor of Coar. The Court in Guidry had opined, inter alia, that it was not appropriate to find "any generalized equitable exception - either for employee malfeasance or for criminal misconduct - to ERISA's prohibition on the assignment or

---

[2]This sum resulted from a calculation of the difference between what the pension fund earned with the mortgage company and what it would have earned had the funds been invested with the pension fund's other investment managers. Id.

8

alienation of pension benefits." 493 U.S. at 376. Notwithstanding the seeming breadth of this language, the Third Circuit found that the pension fund could effect a set-off because ERISA § 409(a) expressly required that trustees undo any harm they cause to the pension plan. 990 F.2d at 1420. Additionally, the Court stated that it read the anti-alienation provision "and, by extension, Guidry, as shielding only the beneficiaries' interest under the pension plan from third-party creditors." Id. at 1420-21. This distinction between third-party creditors and the pension plan itself also applies to the present matter. Like Coar, and unlike Guidry, the Plan, not a third-party creditor, claims a set-off against future retirement benefits for allegedly improperly paid disability retirement benefits.

Specifically applicable to the dispute before this Court, the Third Circuit in Coar also found that Treasury Regulation § 1.401(a)-13(b)(1) further clarifies "this distinction between a set-off of benefits by the plan and a garnishment of benefits by an outsider." Id. Significantly, the Court found that it was not necessary to reconcile ERISA § 409(a) with the ERISA anti-alienation provision because a set-off permitted by the Treasury Regulation did not amount to an alienation. The Third Circuit explained:

> The fact is that under the construction in the IRS regulations of the anti-alienation provision we are not even concerned with section 409(a), for when the Pension Fund, without Coar's consent, set off the benefit's due to him against his debt to it there was simply not an alienation within section 206(d)(1). Indeed, it seems to us that a court would have to stretch section 206(d)(1), which merely requires that the plan provide that benefits "not be assigned or alienated," to encompass a set-off which in the context of this case was nothing more than the Pension Fund's refusal to make payments.

990 F.2d at 1422.

Thus, it is readily apparent that if the Plan has properly determined that Morin owes the Plan for disability payments improperly claimed, then the Plan may set-off Morin's obligation without violating the ERISA

9

anti-alienation provision.

The more recent Third Circuit decision, Martorana v. Board of Trustees, 404 F.3d 797 (3d Cir. 2005), did not alter the analysis in Coar. Further, the case is so factually dissimilar that it provides no guidance for the matter before this Court. In Martorana, the Third Circuit reversed the District Court's order that directed that attorney's fees awarded in favor of the pension fund, be paid by withholding $160.00 per month from Martorana's pension benefits. Notably, the Third Circuit stated that "[b]ecause the present case is factually and legally distinguishable from Coar, we decline to extend the exception to ERISA's anti-garnishment provision to encompass the equitable set-off of pension benefits here." 404 F.3d at 803. Because the issue here involves set-off of the disability retirement benefits that Morin allegedly improperly obtained from the Plan against retirement benefits to be paid by the Plan, the Coar analysis applies and Matorana is inapposite.

The Court is also not persuaded by Morin's argument that the Plan Agreement and the Summary Plan Description must contain a provision that describes the plan's ability to set-off benefit over-payments against future benefit payments. Without any support for the assertion, counsel for Morin flatly states that "in the absence of an 'arrangement' for the collection of overpayments under the Plan, the Treasury Regulation simply does not apply." (Morin Reply Brief, p. 3).

Treasury Regulation § 1.40(a)-13(c)(2)(iii) states that the terms "assignment" and "alienation" do not include "[a]ny arrangement for recovery by the plan of overpayment of benefits previously made to a participant." The term "arrangement" is a broad term that is undefined in the regulation. That suggests to this Court that its meaning should not be as circumscribed as Morin suggests. While an arrangement may certainly encompass an agreement between or among various parties, it can also be understood simply as

10

a plan or course of conduct in which a single party engages to accomplish a desired result. For example, the Oxford English Dictionary defines arrangement as "disposition of measures for the accomplishment of a purpose," as well as "a settlement of mutual relations or claims between the parties...".  1 The Compact Edition of the Oxford English Dictionary, 457 (1971).  Thus, the Plan's determination to set-off the alleged overpayments to Morin against future retirement benefits can be understood as an arrangement. Moreover, the ability to set-off need not be referenced in either the Plan or Summary Plan Description absent some regulation or statute requiring such disclosure.

### II. Setoff Under the Bankruptcy Code

Bankruptcy Code § 553 does not create a federal right of set-off, it only preserves in bankruptcy whatever right otherwise exists. Citizens Bank of Maryland v. Strumpf, 516 U.S. 16, 18 (1995). Section 553 of the Bankruptcy Code provides in relevant part that:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case...

11 U.S.C. § 553(a).

 "Thus, under this section [t]o maintain a right of set-off, the creditor must prove the following: (1) A debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case; (2) the creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case; and (3) The debt and the claim are mutual obligations." Folger Adam Security, Inc. v. Dematteis/MacGregor, 209 F.3d 252, 262-63 (3d Cir. 2000).  In order to succeed on its set-off claim,

11

the Plan must show that these three elements are met. In particular, the Plan must demonstrate that both Morin's obligation for the allegedly improperly paid disability benefits and the Plan's debt to Morin for future retirement benefits arose pre-petition.

The Plan argues that all the criteria for set-off have been met in the instant case, citing to In re Thompson, 182 B.R. 140 (Bankr. E.D. Va. 1995) as illustrative of the proper application of Bankruptcy Code § 553. The Court agrees. Further, the Court agrees that In re University Medical Center, 973 F. 2d 1065 (3d Cir. 1992), does not require a finding that the retirement benefits that Morin will receive in the future are post-petition obligations which cannot be set-off against Morin's obligations for the alleged improper receipt of disability retirement benefits.

In University Medical, the Third Circuit determined that the Department of Health and Human Services ("HHS") could not set-off, by withholding payment for post-petition Medicare services, to recover prepetition overpayments of Medicare reimbursements. 973 F. 2d at 1080. It also determined that HHS did not have a claim for recoupment because the 1985 overpayments HHS made to University Medical were different transactions from the 1998 claims for reimbursement made by University Medical. Id. at 1081.

At first blush, it appears that this analysis results in the Plan being in the same position as HHS since Morin is not presently receiving benefits and cannot receive benefits until he attains the age of 65. However, examination of the Plan Agreement yields the conclusion that Morin's entitlement to a retirement benefit arose pre-petition, and thus the requisite mutuality for purposes of Bankruptcy Code § 553 exists.

Morin rightly points out that under Matter of M. Frenville Co. Inc., 744 F.2d 332 (3d Cir. 1984), the Court must examine when a claim arises in order to determine whether it has accrued pre-petition or

12

post-petition. Under 11 U.S.C. § 101(5)(A), the term "claim" means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured...". Here, it is readily apparent that Morin's right to payment for retirement benefits accrued pre-petition. Section 7.4 of the Plan Agreement addresses the disability retirement benefit and requires at least ten years of vested service. Likewise, § 7.3 requires at least ten years of vested service to be eligible for a vested retirement benefit. Because we know that pre-petition Morin was eligible for and in fact received a disability retirement benefit, we likewise know that Morin has met the requirement for a vested retirement benefit pre-petition. Thus, as in Thompson, Morin had a pre-petition right to payment of a retirement benefit, albeit one contingent upon attaining age 65. Accordingly, the mutuality requirement is met. Both Morin and the Plan stand in the same capacity and hold claims against one another that arose pre-petition.

### III.　Set-off Against Exempt Assets

Morin argues that any right of set-off found in favor of the Plan is without benefit because the greater weight of case authority holds that set-off cannot be made against assets that the debtor claims as exempt under Bankruptcy Code § 522. See, In re Tarbuck, 318 B.R. 78, (Bankr. W.D. Pa. 2004); In re Pace, 257 B.R. 918 (Bankr. W.D. Mo. 2000); In re Jones, 230 B.R. 875, 879 (Bankr. M.D. Ala. 1999); In re Alexander, 225 B.R. 145, 149 (Bankr. W.D. Ky. 1998); In re Cole, 104 B.R. 736, 740 (Bankr. D. Md. 1989); In re Monteith, 23 B.R. 601, 603 (Bankr. N.D. Ohio 1982).

These cases generally argue that to permit set-off against exempt assets eviscerates the purpose of Bankruptcy Code § 522(c). In re Pace, 257 B.R. at 920. The cases resolve the apparent conflict by

construing Bankruptcy Code § 553 as limited to non-exempt property. In re Alexander, 225 B.R. at 149. Additionally, the courts that favor exemptions over set-off rely on the Bankruptcy Code's fresh start policy. Id. Finally, legislative history is mustered to support the supremacy of exemption over set-off. Because the Bankruptcy Code does not include a proposal contained in Senate Bill 2266 to allow the IRS to set-off taxes against exempt property, some Courts have concluded that Congress did not intend to permit set-off against exempt property. Alexander, 225 B.R. at 150; In re Monteith, 23 B.R. at 604.

The Plan counters that in fact the Courts are sharply divided on this matter and that the better reasoned cases permit set-off. See, Junio v. Astoria Federal Savings, 2002 WL 32001412 (E.D.N.Y. 2002)(analyzing both lines of case authority). In fact, this Court agrees that set-off may be had against exempt property. A particularly persuasive and thorough analysis of the issue can be found in In re Bourne, 262 B.R. 745 (E.D. Tenn. 2001).

Bourne rejected the contention that Bankruptcy Code § 522(c) can only be given meaning if exemptions are not subject to set-off. The Court observed that:

> To the contrary, by giving primary effect to the exemption rights of a debtor, the offset right of a creditor is often completely nullified, as would be the result in the instant case. It is just as logical to give effect to both provisions by holding that a debtor may claim an exemption which is valid as to all creditors except one having a right of offset.

262 B.R. 745, 756.

This reading of the Code sections comports with the plain language of Bankruptcy Code § 553 and the principle of statutory construction that requires that statutes be construed so that no part of the statute is rendered void or contradictory. Id. With regard to the argument that legislative history to Bankruptcy Code § 522 favors exemption rather than set-off, the Bourne Court noted that the legislative history "does

14

not mention set-off rights in any respect, whatsoever or whether they may be defeated by an exemption." Id. at 757. Finally, Bourne also observed that a debtor's fresh start is not always paramount. Id. It pointedly noted that Bankruptcy Code § 523(a) contains numerous exceptions to discharge that impinge upon a debtor's fresh start. Id. In short, the more persuasive view is that Bankruptcy Code § 522(c) is not paramount to § 553.

However, this Court is not convinced that this matter is resolved by consideration of either the ERISA anti-alienation provision or reconciling the facial conflict between Bankruptcy Code §§522 and 553. Rather, reference must be had to N.J.S.A. 25:2-1(b), which states:

> Notwithstanding the provisions of any other law to the contrary, any property held in a qualifying trust and any distributions from a qualifying trust, regardless of the distribution plan elected for the qualifying trust, shall be exempt from all claims of creditors and shall be excluded from an estate in bankruptcy...

The statute further defines a qualifying trust as follows:

> For purposes of this section, a "qualifying trust" means a trust created or qualified and maintained pursuant to federal law, including, but not limited to, section 401, 403, 408, 408A, 409, 529 or 530 of the federal Internal Revenue Code of 1986 (26 U.S.C. s.401, 403, 408, 408A, 409, 529 or 530).

The Plan is a qualifying trust inasmuch as Article II of the Plan provides that it is intended to meet the requirements of § 401(a) of the Internal Revenue Code. (Plan Agreement, p. 10). Thus, following the analysis provided in In re Yuhas, 104 F. 3d 612, 614 (3d Cir. 1997), the restrictions imposed by the New Jersey statute constitute a restriction on the transfer of a beneficial interest so that Morin's retirement benefits are not property of the bankruptcy estate under Bankruptcy Code § 541(c)(2). Section 541(c)(2) provides that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable

under applicable non-bankruptcy law is enforceable in a case under this title."

Accordingly, the ultimate question is whether the Plan may assert a set-off in light of N.J.S.A. 25:2-1(b). Here the language of the New Jersey statute is compelling. Rather than enumerate the creditor actions from which property held in a qualifying trust is exempt, the statute simply and broadly provides that such property "shall be exempt from all claims of creditors..." (emphasis supplied). This Court could find no New Jersey case applying this statute to set-off. However, the most sensible reading of the statute is that it encompasses a claim for set-off. It is well-settled that construction of any statute begins with its plain language. Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123 (1987). "Such language should be given it's ordinary meaning, absent a legislative intent to the contrary", Municipal Council of the City of Newark v. James, 183 N.J. 361, 370 (2005). Applying these rules of construction, a plain reading of the phrase "all claims" surely includes set-off, which after all is nothing more than an adjustment of mutual claims between two parties. Accordingly, under N.J.S.A. 25:2-1(b) the Plan cannot set-off its claim for allegedly improperly paid disability benefits against retirement benefits payable by the Plan.

## CONCLUSION

As set forth at greater length above, the Plan may not set-off its claim for allegedly improperly paid disability benefits against retirement benefits due to Morin from the Plan.